KING, C.J.,
 

 for the Court.
 

 ¶ 1. Ronald Husband was convicted of two counts of capital murder of two police officers and sentenced to serve two terms of life, without eligibility for parole, in the custody of the Mississippi Department of Corrections (MDOC).
 

 ¶ 2. Husband appeals his conviction and sentence, raising the following three is
 
 *552
 
 sues: (1) whether the trial court erred in denying his motion for a new trial; (2) whether the trial court erred in failing to include a lesser-ineluded-offense jury instruction for manslaughter; and (3) whether the jury instructions that were given misstated the law and confused the jury.
 

 ¶ 3. Finding no error, we affirm.
 

 FACTS
 

 ¶4. On November 27, 2005, two Wiggins, Mississippi police officers were dispatched in response to a disturbance at the home of Francis Arnold (Francis). Francis testified at trial that prior to the disturbance, she was at Forrest General Hospital with her ailing spouse and Husband, the couple’s close friend. Francis returned home that evening to gather a change of clothes. Shortly thereafter, Husband arrived at her home. Francis testified that Husband’s presence was not surprising because he visited the family often. However, on this occasion, Husband began choking and hitting Francis while accusing her of lying about coming home. She began bleeding and begged Husband to let her clean her face, which he did. On her way to the bathroom, Francis discretely dialed 911. Husband noticed the phone, grabbed it away from her, and threw it, causing the phone to hang up. After the “hang-up” telephone call, the 911 operator called the number back. The call was picked up, and the operator heard sounds of a male and a female arguing, which led the dispatcher to believe that a disturbance was taking place at the home. While on the line, the operator recognized Francis’s voice, but she did not recognize the male voice that she heard. Remaining on the line, the 911 operator dispatched two Wiggins police officers, Odell Fite and Brandon Breland, to Francis’s residence. When Officers Fite and Breland arrived at the residence and saw Francis’s bloody condition, they asked Husband to leave with them. Husband refused and a struggle followed in the front yard. Hearing the continuing struggle, the 911 operator dispatched more help for Officers Breland and Fite.
 

 ¶ 5. Francis testified that during the struggle in the front yard, one of the officers warned that he was going to use mace on Husband. Upon hearing this, Francis moved to the front porch. From the front porch, Francis looked back and saw Husband straddling one of the officers as he was lying on the ground. She then ran into the house. According to Francis’s testimony, Husband was pointing an object at the officer. As Francis entered the house through the doorway, she heard the officer say, “okay, okay,” and then heard two gunshots. Fearing for her safety, Francis ran through the mobile home and exited out of the rear bathroom window. After reaching the shrubbery in the backyard area, Francis heard two more gunshots. She ran from the home and received assistance from a neighbor who drove her back to the scene. Other officers from the Stone County Sheriffs Department, the Mississippi Bureau of Investigation, and several other agencies had arrived at the home to find Officers Fite and Breland fatally wounded in the front yard. These officers also noticed that Officer Fite’s official weapon was missing.
 

 ¶ 6. Francis returned home shortly after the officers were found, but she was instructed to leave. Francis then went to the Wiggins Police Station and gave both a written and an oral statement regarding the event, identifying Husband as the man who had assaulted both her and the police officers. The authorities went to Husband’s home, arrested him, and placed him in custody at the Stone County Sheriffs Department.
 

 
 *553
 
 ¶ 7. Three days later, a dive team recovered Officer Fite’s weapon from a shallow ditch of water located along the road between Francis’s and Husband’s houses. Autopsies performed on the bodies revealed that both officers died from bullet wounds. The bullet wounds were found to be consistent with the type of bullet used in Officer Fite’s recovered gun.
 

 ¶ 8. A Stone County grand jury indicted Husband as a habitual offender for two counts of capital murder of a peace officer in violation of Mississippi Code Annotated section 97-3-19(2)(a) (Rev.2006). Husband filed a motion requesting a change of venue. The trial court granted the change of venue, and the trial was transferred to Lauderdale County. Husband was convicted of two counts of capital murder and sentenced to serve two terms of life, without eligibility for parole, in the custody of the MDOC. After the verdict was read, but before sentencing, one juror expressed doubt as to Husband’s guilt and was dismissed from the sentencing phase deliberations. The juror was replaced with an alternate juror who, in a letter to the court sent after Husband was sentenced, also expressed doubt about Husband’s guilt. After being denied post-trial relief, Husband perfected his appeal. On appeal, Husband seeks a reversal of his convictions and sentences and a new trial. Alternatively, Husband requests that this Court vacate his convictions and sentences and discharge him from custody.
 

 STANDARD OF REVIEW
 

 ¶ ? 9. We review the denial of a post-trial motion seeking a new trial under an abuse of discretion standard.
 
 Dilworth v. State,
 
 909 So.2d 781, 736(¶ 17) (Miss.2005).
 

 DISCUSSION
 

 I. WEIGHT OF THE EVIDENCE
 

 ¶ 10. Husband argues that the trial court erred by denying his motion for a new trial because the verdict was against the overwhelming weight of the evidence. The standard of review for determining whether a jury verdict is against the overwhelming weight of the evidence is well settled. We will not grant a new trial “unless convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice.”
 
 McLendon v. State,
 
 945 So.2d 372, 385(¶40) (Miss.2006) (citing
 
 Groseclose v. State,
 
 440 So.2d 297, 300 (Miss.1983)).
 

 ¶ 11. First, Husband argues that the jury’s verdict was against the overwhelming weight of the evidence because two of the thirteen jurors (twelve original jurors and one alternate) expressed concern regarding the jury’s guilty verdict. After the guilty verdict was read, but before the sentencing deliberations, one juror sent a note to the judge stating that she did not “feel that Ronald Husband [was] guilty” and asked the judge to “please take [her] off the case.” During an in camera interview with the juror, the judge determined that she could not proceed as a juror in the penalty phase of the proceedings because she was “emotionally sick” and, thus, unable to render a fair and impartial verdict in the next phase of the trial. The judge excused the juror and replaced her with an alternate juror. The replacement juror also expressed concern about the guilty verdict in a letter sent to the court after Husband was sentenced.
 

 ¶ 12. “Inquiries into the validity of verdicts are governed by Rule 606(b) of the Mississippi Rules of Evidence, which provides that a juror may not impeach a verdict by using thought processes or discourses which may have contributed to a verdict.”
 
 Johnson v. St. Dominics-Jack-
 
 
 *554
 

 son Mem’l Hosp.,
 
 967 So.2d 20, 25(¶ 15) (Miss.2007). Specifically, Mississippi Rule of Evidence 606(b) states:
 

 [A] juror may not testify as to any matter or statement occurring during the course of the jury’s deliberation or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith....
 

 ¶ 13. Rule 606(b) has been interpreted by the supreme court as prohibiting consideration of any evidence from a juror by affidavit or
 
 any other form of communication
 
 that would invite the court to examine the deliberations of a jury.
 
 See Gladney v. Clarksdale Beverage Co.,
 
 625 So.2d 407, 412 (Miss.1993) (stating that the circuit court did not err in striking juror affidavits as the prerequisite showing under Rule 606(b) for juror testimony was not met). Accordingly, the court refused to disturb the jury’s guilty verdict in
 
 Johnson,
 
 where the appellant alleged that a post-trial e-mail sent to the judge by a juror undermined the verdict announced at trial.
 
 Johnson,
 
 967 So.2d at 25(¶ 17). In that case, the supreme court, relying on Rule 606(b), refused to disturb the jury’s verdict, finding that “jurors may not impeach their own verdicts on the basis of their mental processes or deliberations.”
 
 Id.
 
 at 26 (¶¶ 22-24) (citations omitted).
 

 ¶ 14. We note that Rule 606(b) creates an exception to the court’s inability to inquire into the validity of a verdict by stating “that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror.” However, Husband does not claim that extraneous information or outside influences prejudiced the jury’s verdict. Instead, he argues that two jurors expressed second thoughts about the verdict after the trial was concluded. Thus, “ [i]n the absence of a threshold showing of external influences, an inquiry into a juror verdict is not required.”
 
 Gladney,
 
 625 So.2d at 419. This assertion of error is without merit.
 

 ¶ 15. Next, Husband argues that the physical and forensic evidence presented at trial was insufficient to support the guilty verdict. Husband states that his tire expert testified that the tire prints found at the scene were inconsistent with impressions made of Husband’s actual tires. Husband also states that the glass fragments found on his clothing and in his vehicle did not match the glass fragments found at the murder scene. Conversely, the State argues that, while impressions made from Husband’s vehicle’s tires could not specifically be matched to the tire prints found at the murder scene, Husband was still capable of being at the scene on the night of the murders.
 

 ¶ 16. Husband’s tire expert testified on cross-examination that Husband’s vehicle simply may not have left any prints at Francis’s home at all, depending on the conditions of the ground. Also, the glass identification expert testified that, while he did not think that the pieces of glass found at the scene were consistent with those found on Husband’s sweatshirt and in his car, the unknown glass fragments used for identification were quite small, making them hard to match.
 

 ¶ 17. Other evidence presented at trial contradicts Husband’s assertion that the physical and forensic evidence was insufficient to support the jury’s guilty verdict. When reviewing evidence presented at trial, the jury must “put the evidence together like pieces of a jigsaw puzzle, and
 
 *555
 
 in the end, view the evidence as a whole.”
 
 Jones v. State,
 
 918 So.2d 1220, 1226(¶ 15) (Miss.2005).
 

 ¶ 18. During Husband’s trial, the jury heard testimony from Francis that she was involved in a struggle with Husband moments before the officers arrived on the scene. Evidence found at the crime scene corroborates that there was a struggle at the home. Prior to that struggle, the two were seen together in surveillance photographs from the hospital where Francis’s husband was an admitted patient. In these photographs, Husband is seen wearing a ball cap, sunglasses, a gold chain, and a grey sweatshirt. Three of these items were found strewn about the crime scene. Although a conclusive match could not be made, DNA samples from this evidence did not exclude Husband as having had contact with, or possibly owning, the items. Further, blood evidence taken from an unwashed grey sweatshirt that was found in the washing machine at Husband’s home on the night of the crime was consistent with Francis’s DNA.
 

 ¶ 19. Francis testified that she saw Husband straddling a police officer in the front yard of her home and pointing an object toward the officer. Francis also testified that she heard one of the officers say, “Okay, okay,” while Husband straddled him and pointed the object at the officer. Although Francis could not confirm that the object was a gun, she did testify that she heard gunshots as she fled from the scene.
 

 ¶ 20. During the investigation, the police-issue gun belonging to Officer Fite was determined to be missing. Several days later, the gun was found in a ditch between the crime scene and Husband’s home. A ballistics expert testified that the bullets that fatally wounded both officers were consistent with the type of bullets used in Officer Fite’s gun.
 

 ¶ 21. Based on the aforementioned evidence, a reasonable juror could have found Husband guilty of capital murder of the police officers. We find that there was sufficient evidence to support the guilty verdict. Thus, the trial court did not err by denying Husband’s motion for a new trial. This issue is without merit.
 

 II. LESSER-INCLUDED-OFFENSE INSTRUCTION
 

 ¶ 22. In his second assignment of error, Husband alleges that the trial court should have given a lesser-included-offense instruction on manslaughter. The standard of review for challenges to jury instructions is as follows:
 

 Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.
 

 Humphrey v. State,
 
 759 So.2d 368, 380(¶ 33) (Miss.2000) citing
 
 Heidel v. State,
 
 587 So.2d 835, 842 (Miss.1991) (superceded by statute).
 

 ¶ 23. At trial, Husband proposed a jury instruction on manslaughter as a lesser-included offense. Manslaughter is defined as “[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense .... ” Miss.Code Ann. § 97-3-35 (Rev.2006). The supreme court has defined “heat of passion” as:
 

 A state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will re
 
 *556
 
 duce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
 

 Agnew v. State,
 
 783 So.2d 699, 703(¶ 14) (Miss.2001) (quoting
 
 Graham, v. State,
 
 582 So.2d 1014, 1017-18 (Miss.1991)). In deciding whether to grant a lesser-included-offense instruction, the trial court must consider, taking the evidence in the light most favorable to the accused, and considering all reasonable favorable inferences which may be made in favor of the accused, whether a reasonable jury could find the accused guilty of the lesser-included offense.
 
 McCain v. State,
 
 971 So.2d 608, 614(19) (Miss.Ct.App.2007). Thus, to determine whether a manslaughter instruction should have been given, we must determine if a reasonable jury could have found that Husband acted in the heat of passion.
 
 Id.
 

 ¶ 24. Husband asserts that the evidence supports his contention that the police officers’ murders occurred in the heat of passion, and because of this, he was entitled to a lesser-included-offense instruction that would allow the jury to convict him of the non-capital offense of manslaughter. Husband’s argument is based solely on the 911 call that recorded his argument with Francis. He asserts that the 911 phone call indicated an emotional struggle, which the jurors could reasonably consider as evidence of heat of passion. Conversely, the State argues that the 911 call made by Francis was not enough to rise to the level of heat of passion as defined in
 
 Agnew.
 

 ¶ 25. Husband argues that the supreme court in
 
 Lanier v. State,
 
 450 So.2d 69, 81 (Miss.1984), required reversal based on the trial court’s refusal to grant a manslaughter instruction after the defendant’s statement created some confusion. However,
 
 Lanier
 
 is distinguishable from this case. In
 
 Lanier,
 
 the supreme court found that:
 

 [T]he contradiction arising from the assumed inferences and Lanier’s statement introduced into evidence creates, at best, a conflict between inferences and testimony which could only be resolved by a jury under the guidance of proper instructions. Without the inferences the testimony is uncontradicted that [the officer] fired first and because of this he was entitled to the manslaughter instruction.
 

 Id.
 
 at 80.
 

 ¶ 26. However, a contradiction in evidence does not exist in Husband’s case. Here, the evidence shows that the officers attempted to take Husband in a non-aggressive manner. When that failed, the officers tried to physically restrain him. During the tussle with the officers, Husband gained control over Officer Fite’s gun, which is the gun that killed both officers. There was no evidence presented to the contrary.
 

 ¶ 27. While the 911 call reflects an argument between Francis and Husband, it is not dispositive that the ensuing argument between Husband and the officers was the result of heat of passion. This evidence fails to establish any nexus between the struggle with Francis and any occurrence or event which might have provoked him into killing the officers in the heat of passion.
 

 ¶ 28. Thus, taking the evidence in the light most favorable to Husband, we cannot find an evidentiary foundation for a manslaughter instruction. Thus, we find that the trial court did not err by refusing
 
 *557
 
 the manslaughter instruction. This issue is without merit.
 

 III. IMPROPER JURY INSTRUCTIONS
 

 ¶29. In his third assignment of error, Husband alleges that the given jury instructions misstated the law and confused the jury. As previously mentioned, “[w]hile a party is entitled to have jury instructions submitted that represent his or her theory of the case, an instruction that ‘incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence’ need not be submitted to the jury.”
 
 Nunnally v. R.J. Reynolds Tobacco Co.,
 
 869 So.2d 373, 380(¶ 16) (Miss.2004) (quoting
 
 Entergy Miss., Inc. v. Bolden,
 
 854 So.2d 1051, 1054(¶ 6) (Miss.2003)).
 

 ¶30. Husband alleges that the trial court erred in allowing jury instructions S-2A and S-3A
 
 [1]
 
 because they incorrectly stated the law by including the phrase “with deliberate design to effect the death of Brandon Breland/Odell Fite” and confused the jury.
 

 ¶ 31. As applied in Husband’s case, capital murder is defined as “[m]urder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman.” Miss.Code Ann. § 97-3-19(2)(a). The State acknowledges that deliberate design is not explicitly written into the capital murder statute. However, the State maintains that the deliberate-design language is built into the general murder statute and, thus, merely raised the State’s burden of proof and was essentially harmless error.
 

 ¶ 32. By definition, capital murder incorporates the word “murder” which, pursuant to Mississippi Code Annotated section 97-3-19(l)(a) (Rev.2006), states the additional requirement of
 
 “deliberate design
 
 to effect the death of the person killed, or of any human being.” The supreme court has explained the connection between the capital murder and murder statutes by stating that “[t]he word ‘murder’ within [the capital murder] statute takes its meaning from Miss.Code Ann. § 97-3-19(l)(a) (Supp.1988),” the general murder statute.
 
 Mease v. State,
 
 539 So.2d 1324,1325 n. 1 (Miss.1989).
 

 ¶33. In a similar case, the defendant argued that the language “and of his malice aforethought” in the jury instructions for capital murder was not required by the capital murder statute; therefore, the instruction was improper.
 
 Swanier v. State,
 
 473 So.2d 180, 188 (Miss.1985). The State acknowledged that the language was surplus and was over and beyond the statute’s requirements.
 
 Id.
 
 However, because the additional language only added to the prosecution’s burden of proof, the trial court found that it was harmless error.
 
 Id.
 
 The supreme court affirmed the trial court by stating that there was no evidence of any prejudice whatsoever to the defendant caused by the surplus language.
 
 Id.
 

 
 *558
 
 ¶ 34. Like
 
 Swanier,
 
 the State’s burden of proof was merely bolstered by the deliberate-design language included in the instruction. Thus, any error in the language’s inclusion was harmless. Therefore, we find no merit to this assignment of error.
 

 ¶ 35. Based on the foregoing reasons, we affirm the judgment of the trial court.
 

 ¶ 36. THE JUDGMENT OF THE CIRCUIT COURT OF STONE COUNTY OF CONVICTION OF TWO COUNTS OF CAPITAL MURDER AND SENTENCE OF LIFE FOR EACH COUNT, WITHOUT ELIGIBILITY FOR PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO STONE COUNTY.
 

 LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Jury Instructions S-2A and S-3A read, in pertinent part, as follows:
 

 The Court instructs the jury that the defendant, Ronald Husband, has been charged in Count I/II of the indictment with the crime of Capital Murder. If you find from the evidence in this case beyond a reasonable doubt that: (1) On or about November 27, 2005, in Stone County, Mississippi, (2) the defendant, Ronald Husband, did wilfully, unlawfully, feloniously and without authority of law kill and murder Brandon Bre-land/Odell Fite, a human being, (3) with deliberate design to effect the death of Brandon Breland/Odell Fite....